[No. C036579. Third Dist. Dec. 14, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN ANTHONY SANCHEZ, Defendant and Appellant.

624

**COUNSEL**

Shama H. Mesiwala, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Stephen G. Herndon and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

BLEASE, Acting P. J.—Defendant John Anthony Sanchez appeals from the judgment of conviction on seven counts of animal cruelty (Pen. Code, § 597, subd. (b)),[1] and one count of dissuading a witness. (§ 136.1, subd. (c)(1).) He challenges six of the counts of animal cruelty.

On appeal, he claims the trial court's failure to give a unanimity instruction requires reversal of six counts of animal cruelty. We agree with him as to count 7 because it was based upon evidence of two discrete criminal events, and will reverse the conviction on that count. In all other respects, we will affirm the judgment of conviction because the verdicts on counts 2, 3, 4, 5, and 11 are based upon evidence of a continuing course of conduct.

### FACTUAL BACKGROUND[2]

#### A. *Prosecution's Case*

Defendant owned some property in Macdoel where he kept a variety of animals including dogs, cows, rabbits, ducks, geese, and chickens. The property was very dry and desert like. There were no natural wet spots; the vegetation on the property consisted of juniper trees and sagebrush.

Defendant lived on the property with his then wife, Ruth Sanchez, their daughter, and Ruth's children. The Sanchezes often left their property for up to two weeks without making any arrangements for the care of their animals.

One day in August 1997, when it exceeded 90 degrees, Walter Jerde and James Brown, defendant's neighbors, went to defendant's property because a calf had been bawling loudly for two or three days and could be heard by neighbors a mile away. Defendant had not been seen on his property for four or five days, and no one was home at the Sanchez residence when Jerde and Brown arrived.

---

[1] All further section references are to the Penal Code unless otherwise specified.

[2] In light of the verdicts and the claim of error raised on appeal, we limit the factual summary to those counts challenged on appeal.

They found the calf in an enclosed pen, tied to a post, unable to get to any food or water. Brown and Jerde also saw six to eight rabbits caged inside a room without any food or water. The temperature in the room was in excess of 90 degrees. Four of the rabbits were dead, the other two were gasping for air and suffering needlessly. One of those two rabbits died before Jerde could give it water.

That same day, Brown and Jerde also saw the dead bodies of several ducks, chickens, and geese scattered about defendant's property. The birds had not been killed by predators, although one of the corpses was being eaten by a dog. There did not appear to be any food or water for any of the birds.

Between 1997 and 1998, Bridget Jerde went to defendant's property where she saw dead rabbits in a cage. It was very hot and there was no food or water in the cages. The corpses had already decomposed and the legs and skin of the rabbits were hanging out through the holes of the cages.

On June 24, 1998, Siskiyou County Animal Control Officer Ronald Fisher went to defendant's property in response to a report of abandoned animals. When he arrived, he was unable to find anyone home and the property appeared abandoned. Twelve severely malnourished domestic Toulouse geese swarmed him because they had no food and very little water. There was no pond or large container of water for the geese to swim in. The geese appeared to be in very poor condition. Their feathers were dull and ruffled, some of the geese had hanging wings, and one had an injured leg that had been bitten through by a dog. The geese were all extremely thin. Officer Fisher could actually feel the breastbone and ribs on one of the geese and opined that they may have gone without food for up to a month. Officer Fisher posted a notice for defendant to respond within 24 hours, and two days later he impounded the geese. Despite efforts to restore the geese to health, four of them died as a result of starvation.

Geese require a half-acre of well-managed grass to sustain them, and defendant's property had no lawn. Officer Fisher concluded that based upon the condition of the geese, it appeared they had not been given proper food and water and were subjected to needless suffering.

At an unspecified time, Jerde saw a chicken tied around a dog's neck, which defendant explained was to teach the dog not to chase the chickens. Jerde had seen the dog chasing the geese a couple of times while he was on defendant's property. On another occasion, Jerde witnessed a dog giving

defendant "trouble" so he "got up and gave a good sized boot to him." One incident occurred in 1997, when Jonathan Fay saw defendant firmly kick a dog in the chest for no apparent reason, using his steel-toed boots. The dog flew about five or six feet and started "yipping" for five minutes. He appeared to be in pain.

In August 1998, Jonathan Fay went to the Sanchez property where he saw a burn pit at the back of the house that gave off the odor of decaying animal carcasses. Inside the pit were dead and dying calves and chickens. The chickens that were still alive were unable to extricate themselves from the pit and had no access to food and water. All the animals in the pit, dead and alive, appeared malnourished.

In 1999, Jonathan Fay went to the Sanchez property because he heard calves bawling and dogs barking. On arrival, he saw dead cows. There were also dogs on the property and no food or water had been left for either the dogs or the cows. Fay also saw four or five dead rabbits in cages. The rabbits appeared to have died from lack of food and water which was not present in the cages.

Dr. Harold Spencer opined that rabbits that are caged in the summer heat without food and water are subject to needless suffering because they require tremendous amounts of water or they will overheat and die.

In January 1999, Siskiyou County Deputy Sheriff Christopher Rees went to the Sanchez property where he saw a dead peacock in a pit behind the house. He also noticed a pig's head attached to a tree.[3]

On June 4, 1999, Deputy Rees contacted Animal Control Officer Fisher about an injured puppy on defendant's property. Officer Fisher met him at the property where they saw a black-and-white male bullterrier puppy. The puppy was about three months old. It had a clearly visible, deeply infected hole between its eyes, which was full of live maggots that were moving and eating inside the wound. The puppy's face was covered with mucus, which continued to ooze from the wound. His jaw was protruding and his right eye was about 80 percent closed. The side of his face was covered with dried fluid from his eye. The puppy's eyeball appeared to be dead. It was yellow and had no movement or reflex response. The puppy's gums were pale white, which is a symptom of shock and an indication that death is imminent unless proper care is immediately administered.

---

[3]Jonathan Fay testified that he saw a pig whose head had been sliced off with a hatchet. It is unclear if this was the same pig whose head was seen by Deputy Rees.

There was no indication that the wound had been cleaned or treated. It was determined based upon the species of maggots, that the wound had been inflicted no less than five days before. The severity of the wounds, the extent of the maggot infestation, and the lack of any proper treatment indicated that the puppy had been treated in a grossly negligent manner and was subjected to needless and severe suffering.

Christina Mejias, defendant's stepdaughter, told Deputy Rees that the puppy belonged to her, that she had been visiting her grandmother, and defendant had been taking care of the puppy in her absence. When she left the puppy in defendant's care, the puppy was healthy.

Defendant was arrested on the scene and questioned about the puppy. He told Deputy Rees that the puppy had been injured a "couple days" before when he heard barking or some noise under the trailer where he found the puppy. Defendant indicated that the puppy had previously bothered his chow dog, which was pregnant and irritable, and he believed the chow had caused the puppy's injuries.

Defendant said he noticed the puppy had a little hole in its head and treated it with peroxide. The puppy had been lethargic the last couple of days, but he did not call a veterinarian, the humane society, animal control, or anyone else who would have informed him that they would euthanize the puppy free of charge.

The puppy was impounded and euthanized because of the severity of its wounds and the owners' lack of concern for its well being. An autopsy disclosed that the puppy's injuries were caused by a dog that had engulfed part of the puppy's head and bitten through the sinus, fracturing the skull, crushing the jaw, and severing the right optic nerve. The injury to the optic nerve caused the puppy to lose sight in that eye. The obvious displacement of the puppy's jaw would have prevented it from chewing its food. Leaving a puppy outside after it sustained such injury was improper and risked infection. The puppy would have suffered severely from these injuries.

## B. *Defense Evidence*

Defendant testified in his own behalf. He lived on the property with his then wife, Ruth Sanchez, beginning in 1994. He built a rabbit hutch and a corral. The property also had a pond, which was filled with water during the time the family had ducks and geese. The property also had a burn pit where he threw trash. He never threw live animals into it.

Defendant bought calves, chickens, and rabbits for the family, and Ruth bought the geese. The family fed all the animals and when they were not present to feed them, defendant asked his friend Ron Stout or someone else to feed the animals. Defendant personally fed the animals when he was in town, about once every other week; he also filled the water containers when they were low. Defendant never noticed the animals appearing to have serious health problems.

In December 1998 or January 1999, Sherlyn Braden moved into the Sanchez residence to assist defendant, who had diabetes. Braden took care of the animals and recalled that every day someone would feed the dogs, peacocks, and chickens.

Defendant never saw rabbits on the property, and would not have known if there were dead rabbits because he did not spend much time on the property. He recalled that some chickens had died and he threw them into the burn pit. Defendant denied kicking a dog five feet into the air and denied owning steel-toed boots. He also denied cutting off the head of a pig.

In June 1998, defendant and Ruth separated. Ruth moved to Yreka and defendant moved to Reno for about a month to work. At that time, the only animals on the property were geese, four or five chickens, and a chow dog. Ruth promised to feed the animals while defendant was in Reno and defendant would call her occasionally to remind her to feed the animals. When defendant came home on the weekends twice a month, he would feed and water the animals himself. The geese were also able to eat from the lawn, which Ruth watered and which remained green all year except during the winter months. In 1998, during the time defendant and Ruth were away from the property, Ron Stout went to defendant's property to take care of the animals. In the spring of 1999, Christina Mejias bought a six-week-old puppy, which she kept outside. The puppy was attacked under the trailer on May 30, 1999. When defendant heard the puppy yelping, he went outside to the trailer, but the puppy would not come out. The next morning, it had a scrape beneath its chin and swelling on the side of its face. Braden put hydrogen peroxide on the wound and sent the puppy outside.

The puppy was attacked a second time on June 1, 1999. Defendant and Braden heard noises coming from beneath the trailer, but the puppy would not come out. When they saw the puppy the next morning, it had a swollen face and a hole in its head, which defendant treated by applying bag balm and hydrogen peroxide to ease the infection. Prior to that time, defendant

saw the chow playing with the puppy or growling at him without harming him.

Defendant did not contact a veterinarian to treat the puppy because he did not have the money and because he thought he could care for it himself. However, the puppy continued to jump around and eat and did not appear to be in pain. Defendant did not see maggots in the wound. Nevertheless, defendant decided he was going to euthanize the puppy; however, when Christina came home, she wanted to save the puppy's life. Defendant was unaware of the existence of the Humane Society and did not think it was necessary to call Animal Control.

## PROCEDURAL BACKGROUND

Defendant was charged with nine counts of animal cruelty (§ 597, subd. (b)—counts 1-8, 11), one count of disobeying a court order (§ 166, subd. (a)(4)—count 9), and one count of dissuading a witness. (§ 136.1, subd. (c)(1)—count 10.)

A jury acquitted him on two counts of animal cruelty (counts 1 and 6), and of disobeying a court order (count 9), and convicted him of the remaining charges. He was sentenced to state prison for a total term of four years comprised of two consecutive terms of two years each on counts 8 and 10, with the remaining two-year terms on each count imposed concurrently.

Defendant filed a timely notice of appeal.

## DISCUSSION

Defendant contends the convictions on counts 2, 3, 4, 5, 7, and 11[4] must be reversed because the trial court failed to give a unanimity instruction. He claims that a unanimity instruction is required where, as here, the prosecution argues that various and distinct acts could constitute each charge and the defendant presents different defenses to each act. He also claims that the trial court's instruction on uncharged offenses may have misled or confused the jury thereby contributing to the likelihood the verdicts were not unanimous. This is so, he argues, because the uncharged offense instruction listed five specific events, leaving the jury without guidance on other uncharged acts.

---

[4]In his opening brief, defendant also claimed reversal was required on count 10. However, he withdrew this claim in his reply brief.

Respondent concedes that the conviction on count 7 must be reversed, but argues that a unanimity instruction is not required for the remaining counts because the offense of animal cruelty is a continuing offense, which is not subject to the unanimity requirement. Respondent does not address defendant's claim relating to the uncharged offenses. We accept respondent's concession as properly made and find no error on the remaining counts.

A unanimous jury verdict is required in criminal cases. (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265 [148 Cal.Rptr. 890, 583 P.2d 748]; *People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) ■ It has long been held that a unanimity instruction must be given where the evidence shows that more than one criminal act was committed which could constitute the charged offense, and the prosecution does not rely on any single act. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 275 [107 Cal.Rptr.2d 160].)

Most recently, the courts have distinguished between a criminal act and a criminal event when discussing the need for a unanimity instruction. In *People v. Russo, supra*, 25 Cal.4th 1124, the Supreme Court summarized the rule thusly: "[T]he unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at p. 1135, quoting *People v. Perez* (1993) 21 Cal.App.4th 214, 223 [26 Cal.Rptr.2d 691]; *People v. Davis* (1992) 8 Cal.App.4th 28, 41 [10 Cal.Rptr.2d 381].)

Thus, a unanimity instruction is not required where the criminal acts are so closely connected as to form a single transaction or where the offense itself consists of a continuous course of conduct. (*People v. Diedrich* (1982) 31 Cal.3d 263, 282 [182 Cal.Rptr. 354, 643 P.2d 971]; *People v. Thompson* (1995) 36 Cal.App.4th 843, 851 [42 Cal.Rptr.2d 798]; *People v. Avina* (1993) 14 Cal.App.4th 1303, 1309 [18 Cal.Rptr.2d 511].) This is because in both cases, the multiple acts constitute one discrete criminal event. (*People v. Russo, supra*, 25 Cal.4th at p. 1135.)

The second category of offenses falling into the continuing course of conduct exception has been applied to a limited number of crimes including

failure to provide for a minor child (*People v. Morrison* (1921) 54 Cal.App. 469, 471 [202 P. 348]), annoying or molesting a child (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1015 [230 Cal.Rptr. 237]), child abuse (*People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299]; *People v. Avina, supra,* 14 Cal.App.4th at p. 1311), and contributing to the delinquency of a minor. (*People v. Lowell* (1946) 77 Cal.App.2d 341, 345 [175 P.2d 846, 77 A.L.R.2d 907].)

 While the parties do not address the issue, we are unaware of any case holding that animal abuse, as defined in section 597, subdivision (b) is a continuing offense. We must therefore determine preliminarily whether that offense punishes a continuing course of conduct. An offense is of a continuing nature when it may be committed by "a series of acts, which if individually considered, might not amount to a crime, but the cumulative effect is criminal." (*People v. Epps* (1981) 122 Cal.App.3d 691, 702 [176 Cal.Rptr. 332]; see also *People v. Lewis* (1978) 77 Cal.App.3d 455, 460-461 [143 Cal.Rptr. 587, 3 A.L.R.4th 1185]; *People v. Gunn* (1987) 197 Cal.App.3d 408, 415 [242 Cal.Rptr. 834].)

The courts have looked to the statutory language to determine whether the Legislature intended to punish individual acts or entire wrongful courses of conduct and have concluded that when the language of the statute focuses on the goal or effect of the offense, the offense is a continuing offense. (*People v. Salvato* (1991) 234 Cal.App.3d 872, 882-883 [285 Cal.Rptr. 837] [dissuading a witness]; *People v. Avina, supra,* 14 Cal.App.4th at p. 1311 [residential child molestation].) Other courts have found a continuing course of conduct where the wrongful acts were successive, compounding, interrelated, and aimed at a single objective. (*People v. Dieguez, supra,* 89 Cal.App.4th at p. 275.)

 Defendant was charged with violating section 597, subdivision (b), which imposes criminal penalties on "whoever, having the charge or custody of any animal . . . subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather . . . ."[5]

 The statute may be violated by subjecting an animal to needless suffering, by inflicting unnecessary cruelty, and by failing to provide the

[5]Subdivision (b) of section 597 provides in pertinent part: "(b) Except as otherwise provided in subdivision (a) or (c), every person who overdrives, overloads, drives when overloaded, overworks, tortures, torments, deprives of necessary sustenance, drink, or shelter, cruelly beats, mutilates, or cruelly kills any animal, or causes or procures any animal to be so overdriven, overloaded, driven when overloaded, overworked, tortured, tormented, deprived

animal with food, drink, and shelter. The first two theories focus on the effect on the animal, namely unnecessary cruelty or needless suffering. While unnecessary cruelty and needless suffering may result from a single act, both may also result from the cumulative effect of repetitive acts of abuse in the same way that child abuse may be committed by repetitive acts. (See *People v. Avina, supra,* 14 Cal.App.4th at p. 1311.)

 The third theory under which the statute may be violated, failing to provide food, water, and shelter, defines an offense that, for purposes of our discussion here, is no different from the continuing offense of failing to provide food and shelter for a minor child. (§ 270; *People v. Morrison, supra,* 54 Cal.App. at p. 471.) Certainly malnourishment, starvation, and dehydration are the results of a continuous failure to provide adequate food and water rather than the failure to provide food and water on one occasion.

Moreover, the language of subdivision (e) of section 597, supports our conclusion by stating that each prohibited act under subdivision (c) of that section is a separate offense.[6] No such provision applies to a violation of subdivision (b) of section 597. Thus, a strong inference arises that, unlike subdivision (c), which prohibits single acts of abuse, the Legislature intended subdivision (b) to define animal abuse as a continuous course of conduct offense.

For these reasons, we conclude that animal abuse as defined in section 597, subdivision (b), by inflicting unnecessary cruelty or needless suffering on an animal, may be committed as a continuous course of conduct, and when so committed requires no unanimity instruction. When a violation of the subdivision is committed by failing to provide food, water, and shelter to an animal, it is necessarily a continuing offense and a unanimity instruction is not required.

---

of necessary sustenance, drink, shelter, or to be cruelly beaten, mutilated, or cruelly killed; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, or fails to provide the animal with proper food, drink, or shelter or protection from the weather, or who drives, rides, or otherwise uses the animal when unfit for labor, is, for every such offense, guilty of a crime punishable as a misdemeanor or as a felony . . . ."

[6]Section 597, subdivision (e) states as follows: "For the purposes of subdivision (c), each act of malicious and intentional maiming, mutilating, or torturing a separate specimen of a creature described in subdivision (d) is a separate offense."

Having determined that animal abuse is a continuing offense, we turn to the particulars of the case before us. We first dispense with count 7.[7] As we have just concluded, while animal cruelty may be committed by a continuous course of conduct, it may also be committed by a single act of abuse such as by kicking or beating an animal. Count 7 falls within this second category. The prosecution introduced evidence of two separate incidents in which defendant kicked a dog during the period of time charged in the information. One incident occurred when defendant kicked a dog with a steel-toed boot during a barbecue on his property. A second incident occurred when he kicked a dog that was in his way while he and Walter Jerde were installing a septic system on defendant's property.

As respondent properly concedes, this count must be reversed because the evidence establishes two discrete criminal events of cruelty to dogs, each sufficient to support a conviction under section 597, subdivision (b), and separately punishable under section 654 and each subject to a different possible defense. Failure to give a unanimity instruction on this count cannot be said to be harmless beyond a reasonable doubt (*People v. Deletto* (1983) 147 Cal.App.3d 458, 472 [195 Cal.Rptr. 233]) and was therefore reversible error.

Turning to the remaining counts, defendant was charged with five counts of animal abuse. (§ 597, subd. (b)). Counts 2 (rabbits), 3 (ducks), 4 (chickens) and 5 (geese), were all based upon evidence establishing that defendant failed to provide adequate food and water for these animals on an ongoing basis during the charged period of time, causing malnourishment and dehydration, which resulted in the needless suffering of those animals, and the death of many of them. Because this is a continuous course of conduct offense, no unanimity instruction was required.

Count 11 was based on evidence defendant failed to provide any medical treatment for a puppy that was severely wounded. Defendant's offense was a form of continuing neglect by failing to provide adequate medical care, much like failing to provide adequate food, water, and shelter. Defendant's continued failure to provide adequate care and treatment for the puppy was successive, compounded, and interrelated. (*People v. Dieguez, supra,* 89

---

[7]Count 7 charged: "CRUELTY TO AN ANIMAL: The said, JOHN ANTHONY SANCHEZ, on or between 1997 and 1999, did unlawfully deprive animals, namely dogs, of necessary sustenance, shelter, and/or drink; and, having the charge or custody of said animals, either as owner or otherwise, subjected said animals to needless suffering, or inflicted unnecessary cruelty upon the animals, or in any manner abused said animals and/or failed to provide the animals with proper food or drink, or shelter or protection from the weather, violating Section 597(b) of the California Penal Code, a felony."

Cal.App.4th at p. 275.) Accordingly, a unanimity instruction was not required.

Defendant argues however, that a unanimity instruction is required because the prosecution distinguished between various incidents of animal abuse, including uncharged acts falling outside the period of time charged in the information, and he asserted multiple defenses.

Defendant's first claim is based on a misunderstanding of a continuous-course-of-conduct offense. By its very nature, it is established by proof that the conduct took place repeatedly throughout the charged period of time.

As to his claim that the court failed to adequately instruct on uncharged acts, we see no harm. Defendant does not claim the evidence was erroneously introduced and he did not request a clarifying or modifying instruction. ■ " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' (*People v. Lang* (1989) 49 Cal.3d 991, 1024 [264 Cal.Rptr. 386, 782 P.2d 627].)" (*People v. Coddington* (2000) 23 Cal.4th 529, 603 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) ■ Defendant has therefore waived any claim of error in that regard. The jury was instructed on the time period of the charged offenses and the verdict forms correctly reflected those time periods.[8]

We also reject defendant's claim that his assertion of multiple defenses requires a unanimity instruction. In defense of count 4, defendant claims he

---

[8]Count 2 (rabbits)—while defendant asserts there were two bases for conviction, one occurring during the charged period and one occurring in 1999, outside the charged period, the verdict forms reflect the jurors' unanimous agreement that the factual basis for conviction on count 2 was the animal abuse occurring between the summer of 1997 and the summer of 1998.

Count 3 (ducks)—defendant similarly asserts there were two bases for conviction as to abuse of the ducks, the dead ducks observed in 1997 or 1998, the other dead ducks observed in 1999. Again, the verdict form reflects the factual basis for conviction on count 3 occurred during the charged period of time between the summer of 1997 and the summer of 1998.

Count 4 (chickens)—the evidence in support of count 4 established that several witnesses observed dead and dying chickens left without access to food or water on two separate occasions. The first occurrence was witnessed by Walter Jerde in August 1997; the second occurrence took place in August 1998 when Jonathan Fay saw dead and dying chickens trapped in the burn pit without access to food or water. Both instances of abuse took place within the charged period between the summer of 1997 and the summer of 1998.

Count 5 (geese)—the evidence offered in support of this count is confined to one criminal event occurring within the charged date, the starvation and abandonment of the 12 Toulouse geese discovered by Officer Fisher on June 24, 1998. While defendant refers to another instance where a dog cornered a goose, that event took place at an unspecified time. It is not reasonably probable that the jury would have relied on that as a basis for convicting defendant

raised separate defenses to the two instances of abuse established by the evidence: (1) he denied that the chickens were uncared-for, citing testimony that either he, his wife, or Ron Stout fed the chickens, and (2) he denied throwing live chickens into the burn pit. A unanimity instruction was not required because these "two defenses" did not defend against two separate criminal events. The thrust of the prosecution's evidence and their argument to the jury was that defendant failed to provide adequate food and water for his chickens on an ongoing basis, during a one-year period, causing the birds to suffer needlessly. Therefore, these two instances constitute proof of successive, cumulative failure to provide adequate food and water for his chickens over a one-year period. We therefore reject his claim.

As to count 11, defendant argues that the conviction on count 11 must be reversed because it could have been based on any number of separate theories to which he asserted separate defenses. He points to evidence relied upon by the prosecution that he kept the puppy outside with a pregnant chow, he failed to call a third party to treat the puppy's wounds, he failed to provide treatment for the puppy's wound other than putting peroxide on the wounds, and he failed to do anything about the maggots, leaving the puppy to suffer for five days without putting it down. He defended against these theories based upon evidence that he never saw the chow attack the puppy, he applied hydrogen peroxide to the puppy's wound the day after the puppy received the wound, he has bad eyesight and did not see the maggots, and he did not call a third party because he had no money.

As we stated above, defendant's offense with respect to the puppy was a form of continuing neglect. His failure to provide adequate medical treatment, keeping the puppy outside, which subjected him to greater risk of infection, and failing to contact third parties to treat or euthanize the puppy free of charge, all contributed to the puppy's needless severe suffering. As such, they constituted acts and omissions that were successive, compounded, and interrelated. (*People v. Dieguez, supra,* 89 Cal.App.4th at p. 275.) Defendant fails to establish that his various defenses attended to different criminal events. The fact he never saw the chow attack the puppy does not negate the gravamen of the offense that he was aware the puppy was injured and did nothing to treat its wounds.

Because we conclude there was only one criminal event upon which the verdict could have been based stemming from the puppy's needless suffering from his wounds, we reject defendant's claim.

on count 5. To the contrary, as with counts 2, 3, and 4, the verdict form establishes that the verdict was based on the event occurring on the date charged in the information.

## Disposition

The judgment is affirmed as to all counts, except count 7, which we reverse.

Sims, J., and Davis, J., concurred.

A petition for a rehearing was denied January 14, 2002, and on January 9, 2002, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied March 13, 2002.