Filed 3/28/13  P. v. Davis CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH LAMONT DAVIS,<br><br>    Defendant and Appellant. | D061059<br><br><br>(Super. Ct. No. FVI700493) |

APPEAL from a judgment of the Superior Court of San Bernardino County,

John M. Tomberlin, Judge.  Affirmed as modified.

A jury convicted Kenneth Lamont Davis of first degree murder (Pen. Code,[1]

§187, subd. (a); count 1), first degree burglary (§ 459; count 2); and first degree robbery

(§ 211; count 3).  The jury also found the murder was committed for financial gain

(§ 190.2, subd. (a)(1)), while lying in wait (§ 190.2, subd. (a)(15)), and during the

commission of a robbery (§190.2, subd. (a)(17)(A)).  In addition, the jury found true the

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

enhancement that Davis committed all three counts with knowledge that another principal was armed with a firearm.  (§ 12022, subd. (d).)

The court sentenced Davis to prison for life without the possibility of parole, plus a consecutive term of three years for being vicariously armed with a firearm on count 1, and a consecutive term of six years on count 2.  The court stayed the sentence of the remaining count and enhancements.

Davis appeals, contending his conviction on count 1 should be reversed because the trial court failed to give a unanimity instruction on the murder charge and there was insufficient evidence to support the conviction.  Davis also maintains that his three-year enhancement under section 12022, subdivision (d) must be reversed because it does not apply to his convictions.  We agree with Davis that the three-year enhancement under section 12022, subdivision (d) was given in error.  We otherwise affirm the judgment.

FACTS

*Prosecution*

Discovery of a Homicide

On March 15, 2007, Amos Van Fleet (Amos) reported his son, David Van Fleet (Van Fleet), missing after he had been unable to reach his son by cell phone.  Later that day, Amos met some sheriff's deputies at his son's house to allow them in the house to investigate.

Everything appeared to be in order until the deputies found a pool of blood on the floor near the headboard in the master bedroom.  Due to the amount of blood, it looked to be the scene of a homicide, so a deputy cordoned off the house with crime scene tape and

2

began a crime scene log to document everyone going into the house during the investigation.

Later that night, a homicide investigation team arrived at Van Fleet's house. The garage appeared to be neat and well organized with three vehicles parked in it. A Subaru sedan and a motorcycle, which were both in pristine condition, were a stark contrast to the black Ford F150 pickup truck, which was caked in dust and had mud on the tires. There appeared to be two drops of blood on the floor of the garage, near the right front tire of the truck. Because part of the tire extended over the drops, the drops must have been on the floor before the truck was parked. In front of the truck was a green, outdoor trash can. There were red stains all over the inside of the trash can that looked like blood. There also was blood on the truck's tailgate, and more blood was found when the tailgate was opened.[2] A note on top of the washing machine said: "Don't forget Friday March 16th moving day."

The house appeared neat and clean, so a dark pair of work gloves on a small table in the entryway seemed out of place. There was a red stain on the thumb and palm areas of one of the gloves. A cell phone was on the arm of a chair in the living room.

On the floor at the foot of the bed in the master bedroom was a five-foot long wooden pole that was smeared with what looked like blood. A pair of eye glasses was on the dresser. The pool of blood on the floor near the head of the bed stood out against the light brown carpet. There was blood on the headboard, blood spatter on the wall, and

---

[2] Van Fleet was the source of all the blood found in the garage and on the vehicles.

3

drops of blood on the nightstand. Bullet strikes, caused by fragments from a bullet, were visible on the wall, and bullet fragments were found on the floor behind the night stand and inside a trash can next to the night stand. An empty gun holster was found in the bottom drawer of the night stand, but no guns were found in the house. There were only sheets on the bed, and the top sheet had been laid sideways over the mattress. When the sheets were pulled back, a large blood stain could be seen on the mattress, directly above the blood pool on the floor.[3]

## Steven Jones

During the course of the investigation, the detectives became aware of an individual named Steven Jones. Jones was the boyfriend of Vince Bommarito's daughter. Jones had trouble staying employed and had impregnated Bommarito's daughter. Bommarito wanted to help him to become more stable, so he asked Van Fleet, his friend for the past 20 years, if Jones could stay in his guest room. Van Fleet agreed to take Jones in. However, after Jones lost his job and could not pay rent, Bommarito talked to Van Fleet about having Jones move out of the house because Jones was not holding up his part of the bargain by keeping a job.

Sheriff deputies searched a truck owned by Jones. The only thing they found in the truck that appeared to have come from Van Fleet's residence were some cigars.

Davis was a friend and former roommate of Jones. Davis and Jones had shared a house together during the summer of 2006.

---

[3]    Van Fleet was the source of all the blood found in the master bedroom.

4

The Arrest and Interview of Davis

On March 17, 2007, Detectives Jonathan Billings and Neal Rodriguez went to the Wienerschnitzel restaurant in Phelan looking for Davis. From there, the detectives went to a residence. They arrived at the house about 11:30 p.m. and saw a pickup truck parked in the driveway. The dome light in the truck was on and the detectives could see a female in the driver's seat and a male in the passenger seat. As Rodriguez approached the passenger side of the truck, Billings saw a Black male, who he identified as Davis, get out. Rodriguez grabbed Davis's wrists and said something about a gun. As Rodriguez held Davis's hands up on his head, Billings removed two handguns from the front of Davis's waistband. A silver necklace[4] was found in Davis's left pant pocket. Several expended nine-millimeter casings were in another pocket. Davis was taken into custody and transported to the Victorville police station where he agreed to be interviewed.

After Rodriguez advised him of his rights, Davis waived his rights and said he was "ready to tell you guys everything." Davis said Jones had owed him $100 for some sound equipment, and had called and said he had the money. Davis told Jones where he was living (Van Fleet's house) and Jones went to his house, but Jones delayed paying Davis. Davis had to go to work at the Wienerschnitzel in Phelan. Jones met him there after work and they returned to Davis's house in Hesperia for a while. Next, they went to Van Fleet's house again. Jones said he wanted Davis to "off somebody," but Davis told him that was not for him. Jones handed Davis a nine-millimeter handgun. When Davis

---

4       At trial, Amos identified the silver necklace as one his "son wore most of the time."

refused to use it, Jones told him his fingerprints were already on the gun. Davis said he went into the garage of the house and that was where he was when he heard the gunshot. Davis went into the room and saw Van Fleet lying there, making a snoring noise. Jones asked him to help move the man into the truck. Davis said he "didn't feel right" and thought about calling the police, but did not do so. They wrapped Van Fleet "up in his own blanket" and put him in the truck. Jones dropped Davis off at his house and said he was going to take Van Fleet to the aqueduct.

Rodriguez asked what day Jones had called him. Davis said he thought it was on Tuesday, but was not sure because he had "a pot head" and could not remember anything. Rodriguez said it was now Saturday and asked if Davis had been fired two days earlier. Davis said he had not been fired. Jones had gone to the home of Davis's girlfriend and told her he had the money he owed Davis. When Davis learned Jones had his money, he called Jones on his cell phone. Jones agreed to pick Davis up from work because Davis did not have a car. Davis thought everything had happened on Tuesday night, because they let him off work early at 10:00 p.m., and that was when Jones picked him up in his car. Davis was starting to think Jones took him to Van Fleet's house to set him up. Davis remembered Jones telling him that the guy he was living with had hit someone with his car. Jones also told him Van Fleet owed him money.

In response to Rodriguez's request for clarification, Davis explained what happened after Jones picked him up at work. Jones picked him up at the Wienerschnitzel and drove him home, where he changed out of his work clothes. They talked about Jones's new baby and stayed there until Davis's roommate got home. Jones seemed to be

6

doing well. Davis said he did not have anything to do with the killing of Van Fleet and all he did was take the Van Fleet's weapons.

Rodriguez asked how long they had stayed at his house. Davis said they were there for about an hour before going to Van Fleet's house. After they got to the Van Fleet house, Jones told him Van Fleet owed him money and he did not think he was going to get paid. Jones said he had "off'd" someone for Van Fleet. Van Fleet had hit someone with his car, and that person was pointing him out to police, so Jones "did something with him."

Davis said they got to Van Fleet's house around 11:20 p.m. or midnight. Afterwards, Davis got back to his own house around 4:00 a.m. While they were at Van Fleet's house, Jones showed Davis his bedroom. Davis said he was sitting on Jones's bed when Jones walked in and showed him a black, nine-millimeter handgun that looked like a Glock. Rodriguez asked if that gun had been one of the guns they found on Davis that day. Davis said no, that had been a .38 special "collectible" he planned to give back to Jones, but he had bought some shells and had fired it. It was while Jones was showing him the black gun that he told Davis about how he had "off'd" someone for the guy who was sleeping, and the guy had promised to pay him, but never did. Davis knew Van Fleet was sleeping because he could hear him snoring. Davis said Jones "was trying to do it, and I was like, I was getting ready to do it, and I was like what the fuck? Nah, dude, like, nah." Davis digressed again and said his uncle was already doing "24 to life," and that he had been waiting for the police to show up at his door.

7

Rodriguez then asked Davis if he went into Van Fleet's bedroom, and if he heard Van Fleet snoring. Davis responded, "Once, once we, once we went in the room with the guy that was sleeping." He said he stood by the bathroom and Jones "was gonna do it," but Davis walked out of the room "like it wasn't meant for me to do it," and went to the garage where he heard the pop. Davis said it really shook him up. He had made claims in the past about being in a gang, but he had never really belonged to a gang.

Davis said Jones told him to help clean things up. Davis was shaking, but Jones was calm. Davis did not want to help clean, but he "just wrapped [Van Fleet's] feet." They put Van Fleet in the trash can "so he wouldn't leave a trail or anything, rolled him over to the damn truck," and Jones told him to help get him in the truck. Davis said he was afraid that if he did not help, Jones would "snap" and kill him too. When he was asked how they wrapped him up, Davis said they used sheets and some black gun tape. Jones told him to start ripping things off of the bed, so he did, and said: "I took my gloves off because I didn't care after that."

After they loaded Van Fleet into the truck, Davis went along as Jones drove to the aqueduct near Phelan. He said Jones kept looking at him and he was afraid. After Jones dumped the body into the aqueduct, Jones drove him home. When Davis was asked where the black gun was, Davis did not answer, but he said the shells they took from his pockets that day were from that gun. He was going to throw them away, but then he decided he "was gonna return everything back," because "this ain't right." When he was again asked where the gun was, he said Jones had it. Davis said Jones handed him the expended shell casing in the bedroom and he put it in his pocket. The other casings in his

8

pocket were from shots Davis fired into the dirt to empty the gun while they were stopped at the aqueduct.  After Davis picked up the shells from the ground, Jones dumped the body into the water.  Jones took the empty gun away from him and put it under the seat in the truck.  Billings asked what he heard and saw after the gunshot.  Davis said the man was still snoring, but there was blood coming from his mouth and blood right behind his ear.  He was lying on his side.  Billings asked where they had been when Jones first talked about shooting the man.  Davis said they had been in Jones's bedroom.  When Billings asked how many minutes elapsed between the discussion and the gunshot, Davis said it had been hours.  Jones said Van Fleet owed him money and they were supposed to talk about it, but they had not talked about it.  Jones wanted Davis to go into the room and shoot Van Fleet.  When Davis refused, Jones did it.  During the two hours or so that he was in Jones's bedroom, Davis was afraid of Jones because Jones had already told him that he had killed someone.

Billings asked Davis to tell them exactly what Jones said.  Jones had said he and Van Fleet had hit a man with a car right in front of the house, and the man was going to point them out, so Van Fleet gave Jones a gun and told Jones to go out and shoot the man.  Davis said Jones "ended up whacking the guy for him."

Billings asked Davis when he put his gloves on.  Davis said he had been wearing his gloves that night.  He always had his dirt bike gloves with him because he walks to work and it is cold.  Davis took six guns out of Van Fleet's bedroom and put them on the bed.  He took the two guns they had found on him and the necklace.  Davis thought the shooting happened around 3:00 a.m.  He had not talked to Jones since that night, except

9

for one phone call Jones made to him after he dropped him off at his house to let him know he made it home.

Rodriguez told Davis his story did not make sense and asked if they had planned to murder Van Fleet for money. Davis said they had not. After more questions about locating the gun, Davis finally "[swore] to God" he sold the murder weapon to a guy in Victorville to just get rid of it, but later said he gave it away. Rodriguez pressed the issue and told Davis that the truth does not change and they knew he had been at Van Fleet's house. Davis repeated his story about Jones telling him he had killed somebody for Van Fleet, and had waited seven months and had not been paid, and that Van Fleet "had all this money in there." After everything happened, Jones paid Davis the $100 he owed him, but Davis claimed he did not know the money's origin.

The detectives said they would be able to trace everything Davis did in the house by his DNA, which was constantly being left everywhere from a person's hair or sweat, and asked what he did after the shooting. Davis said he walked around the room to "see stuff that I wanted, might, I, I touched. The top drawer I put my hand on that, to get that necklace and it was on top." He also took a cigar box, but had already burned it in case someone recognized it. The detectives kept asking Davis where the gun was, and he said he took it to the mall and gave it to a guy. Later he said he just threw it away. Davis said he tossed it near his house "where you guys turned around at." After taking a break in the interview, Rodriguez told Davis they had detectives on their way to his girlfriend's house to execute a search warrant to find the gun, but he could put a hold on that if Davis led them to where he tossed the gun. Davis agreed to do so. Davis also agreed to show them

10

where the body had been dumped into the aqueduct. Davis next said that he gave the gun to a guy named Daz in Victorville who was in a gang, and he "[swore] to God" he did not know where Daz lived. After Jones shot Van Fleet, the plan was to get rid of the guns. Davis said he got the two guns they found on Van Fleet back from the person he had given them to and was planning to turn himself in.

Davis made several more changes in his story, e.g., giving the gun to a friend, being afraid of repercussions from the person he gave the gun to. After Bell said he did not care about anything else his friend did, all he cared about was finding the gun, Davis finally said he gave the gun to Jesus Galvan and provided directions to where he lived. He knew Jesus had given the gun to his brother, Daniel, because he had seen Jesus earlier that day and that was what Jesus told him.

Davis said Jones "framed" him, and that the body was dumped from the bridge where Beekley crosses the aqueduct. Davis said he took his gloves off in the house because he did not care anymore and did not want to hide who he was. He did not call the cops because he was afraid Jones would kill him.

The Gun

At trial, Jesus Galvan testified that in March 2007, Davis wanted to sell him a nine-millimeter handgun for $150. Davis gave him the gun, even though Jesus did not pay him the money. Jesus, in turn, gave the gun to his brother, Daniel.

Daniel identified the handgun marked as People's Exhibit No. 118 as the handgun given to him by his brother. He had possessed the gun for less than one day when the

11

sheriff's detectives arrived at his house, looking for it. Daniel identified Davis as someone who used to work with him and his brother.

Amos identified the handgun marked as People's Exhibit No. 118 as a gun Van Fleet's brother, Randy, had sold to Van Fleet.

The Discovery of Van Fleet's Body

Marcos Moreno worked for the California Department of Water Resources and his job in March 2007 was to patrol a 30-mile stretch of the California aqueduct from Silverwood Lake to Pear Blossom. One of his check points controlled the flow of water into Silverwood Lake and there was a trash rack there to catch things before the water reached a power plant right before the lake. Moreno had been advised of the possibility that a body had been dumped into the aqueduct. On March 20, 2007, Moreno was at the check point near the trash rack when he saw a naked body in the water about 100 feet away, moving with the current. Moreno drove about two miles up the road to get cell phone service. He called 9-1-1 and waited there for the sheriff's deputies to arrive so he could lead them to the location. By the time he returned with the deputies, the body was up against the trash rack. After the deputies verified that there was a body in the aqueduct, homicide detectives and the coroner were notified. A deputy coroner subsequently arrived at the scene and transported the body, in a body bag, to the morgue.

Van Fleet's Autopsy

Pathologist Steven Trenkle performed the autopsy on Van Fleet's body on March 21, 2007. The body was "moderately decomposed." There was some bloating of tissues and skin slippage. The hands and feet were very wrinkled from having been in

12

the water. Van Fleet had been six feet tall and weighed 245 pounds. X-rays were taken of his head and several small metallic fragments from a bullet could be seen. Trenkle observed two gunshot wounds to the left side of the head. The entrance wound was about an a third of an inch above the left ear and the exit wound was at the outside edge of the left eyebrow. The exit wound was larger and more irregular than the entrance wound. Tiny pieces of the bullet and skull broke off and continued into the brain. However, most of the bullet ricocheted off of the side of the skull, forcing pieces of the bullet and skull out of the exit wound. There were several skull fractures, which were "not uncommon with gunshot injuries." Fractures "extended downward from this hole and one fracture extended upwards over the top of the head" to the right side.

The bullet fragments were in the left frontal lobe of the brain, which was a less vital area than the brain stem, which regulated respiration and heart beat. The damage caused by the injury would have affected motor skills on the right side of the body. There was also "a concussion effect" caused by the force of the kinetic energy in the bullet. Trenkle said the wound suffered by Van Fleet would not have been immediately fatal. In Trenkle's opinion, Van Fleet was likely unconscious after he was shot. With immediate medical attention, Van Fleet could have survived. Without medical attention, he could have lived "several hours to many hours." The farther away from the deep, respiratory regulating part of the brain an injury is, the longer one could survive. Depending on how much bleeding there was, Van Fleet could have bled to death before succumbing to the brain injury. Trenkle's opinion was that the cause of Van Fleet's death was "[g]unshot wound to the head with probable drowning." Trenkle admitted that any

13

time a body is found in water, drowning was a possibility. Due to the degree of decomposition, any physical indications of drowning were obscured, so he was unable to make a determination of drowning during the autopsy. Trenkle had been informed that someone had reported hearing Van Fleet "breathing with loud snoring-like respirations after the gunshot wound and before he went into the water, which would indicate to [him] he was alive."

On cross-examination, Trenkle admitted he did not know how long before Van Fleet was put into the water the person had heard him breathing. That did not change his opinion as to the cause of death because a person with the kind of gunshot wound suffered by Van Fleet could have lived for several hours. Trenkle's dictated notes provided: "Suspect described as having loud, snoring-like respirations before they dumped the body into the canal." When he testified the gunshot wound suffered by Van Fleet would not have been immediately fatal, Trenkle meant within a few minutes, not the literal "immediately."

Trenkle testified that even after a person has died, "blood can ooze out or leak out." It is common to find blood inside body bags in gunshot cases because the body is moved and jostled. Trenkle did not know how rapidly Van Fleet was bleeding, or how much blood was lost. Because Van Fleet had an enlarged heart, the loss of one quart of blood may have been sufficient to kill him. Trenkle could not pinpoint when Van Fleet died.

*Defense*

Dr. Jose Fuentes was a clinical neuropsychologist with special training in neuropsychological functions. On September 20, 2011, and October 14, 2011, Fuentes conducted an assessment of Davis that included obtaining a history of his background and the administration of several tests. Fuentes found Davis had an IQ of 76, which was borderline mentally retarded. Davis also met the criteria for having a combination of attention deficit and hyperactivity disorder, in addition to having "a significant history of dependence cannabis or marijuana use."

Fuentes testified that when someone like Davis was put under stress by having someone hand him a gun and tell him to go into another room and shoot a sleeping man, "it heightens the likelihood of more impulsive responding and less reasoned responding."

DISCUSSION

I

*JURY INSTRUCTIONS*

Davis argues the court erred by failing to provide, sua sponte, a unanimity instruction to the jury. Davis reasons the prosecutor presented evidence of multiple acts to support the count for first degree murder -- a shooting and drowning -- but failed to elect which specific act he relied on to prove first degree murder.

We review claims of instructional error de novo. (*People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

When a defendant is charged with a single criminal act, but the evidence reveals more than one instance of the charged crime, either the prosecutor must select the

15

particular act upon which he relies to prove the charge or the jury must be instructed that it has to unanimously agree beyond a reasonable doubt that the defendant committed the same specific criminal act. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 (*Russo*).) If the prosecutor does not make a selection, the court has a sua sponte duty to give a jury instruction that the jury must unanimously agree upon the act or acts constituting the crime. (*Ibid.*)

As our Supreme Court has explained: "[T]he unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Russo*, *supra*, 25 Cal.4th at p. 1135.) Whenever such instruction is required, the court has a sua sponte obligation to give CALCRIM No. 3500. (See *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1534.)

No unanimity instruction is required, however, when the crime is a continuing one and falls within the continuous course of conduct exception, i.e., while the crime may involve the doing of individual acts, the conduct is essentially indivisible in a real or evidentiary sense. (*People v. Riel* (2000) 22 Cal.4th 1153, 1199; *People v. Sanchez* (2001) 94 Cal.App.4th 622, 631.) Such exception arises where the criminal acts are so

16

closely connected as to form a single transaction or where the statute defining the offense itself contemplates a continuous course of conduct or a series of acts over a period of time, such as first degree murder. (See e.g., *People v. Santamaria* (1994) 8 Cal.4th 903, 918-919; *Schad v. Arizona* (1991) 501 U.S. 624, 630-645.) "The primary significance of defining a crime as a continuous course of conduct is that the jury need not agree unanimously that the defendant committed any particular act or acts; it need only agree unanimously that he or she engaged in the prohibited conduct." (*People v. Culuko* (2000) 78 Cal.App.4th 307, 325.)

As pertinent to this case, the crime of first degree murder has been found to fall under this latter situation because a jury "need not decide which of several proffered theories of first degree murder liability governs the case." (*People v. Lewis* (2001) 25 Cal.4th 610, 654.) Here, the prosecutor advanced three alternative theories to support a first degree murder conviction: willful, deliberate, and premeditated murder; murder by lying in wait; and felony murder. Although the prosecutor relied on three alternative theories, the various theories did not constitute separate or distinct crimes that would require unanimity instructions.

Davis, however, maintains the unanimity instruction was necessary because it was never proved when Van Fleet died. If Van Fleet died from the gun shot, Davis argues the jury would have been required to find that he aided and abetted the murder or robbery before or at the time of the shooting. In the alternative, Davis contends if Van Fleet died from a combination of the gunshot wound and the drowning, Davis was guilty of felony murder and the jury could have found malice because he helped to dump Van Fleet's live

17

body into the aqueduct.  Davis further points out that during closing argument, the prosecutor claimed the jury could convict Davis for aiding and abetting after the shooting if they believed Van Fleet was still alive and the jury was not convinced Davis was culpable up to that point.  We are not persuaded.

The jury found true that the murder was committed by means of lying in wait under section 190.2, subdivision (a)(15).  The lying-in-wait " 'special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. . . ."  [Citations.]' "  (*People v. Moon* (2005) 37 Cal.4th 1, 22.)  Here, Davis and Jones entered Van Fleet's residence at a time they believed Van Fleet to be asleep, observed him sleeping, and waited a few hours before Jones shot a sleeping Van Fleet.  We struggle to contemplate how the jury could have convicted Davis of murder by a means of lying in wait if it did not believe Davis was aiding and abetting Jones prior to or at the time of the shooting.  The opportune time to attack occurred when Van Fleet was sleeping and the surprise attack consisted of Jones shooting Van Fleet.  The jury could not have found true the special allegation of lying in wait after the shooting because the surprise attack already occurred.  And, it was clear that Van Fleet would die without medical treatment from the head wound.  It does not fit the requirements of the special circumstance of lying in wait for Davis to be waiting for Jones to shoot Van Fleet before Davis "attacked" Van Fleet by wrapping him up, placing him in a trash can, and dumping him in the aqueduct.

18

With the record before us and the jury's true finding of the lying-in-wait special circumstance, it is clear that the shooting of Van Fleet in the head caused the chain of continuous events that led to the Van Fleet's body being thrown in the aqueduct, and the jury was convinced beyond a reasonable doubt that Davis was aiding and abetting Jones at the time Jones shot Van Fleet. The fact that the exact time of death could not be determined does not change this analysis. No unanimity instruction was required.

Moreover, because the jury verdict shows the jury also found Davis guilty of committing murder during the commission of a robbery, burglary in the first degree, and robbery in the first degree and that Davis was aware Jones was armed with a firearm during the commission of all three crimes, even if instructional error somehow occurred, it did not prejudice Davis.

II

*SUBSTANTIAL EVIDENCE*

Davis next argues substantial evidence does not support the prosecution's alternative theory that Van Fleet had died from drowning after he was dropped into the aqueduct. We disagree.

Normally, in assessing whether substantial evidence supports a defendant's conviction, we must consider both theories of guilt advanced by the prosecution to determine whether either theory is supported by substantial evidence. (*People v. Guiton* (1993) 4 Cal. 4th 1116, 1126-1129 (*Guiton*).) If one of the prosecution's alternative theories suffers from an inadequacy of proof that is purely factual, "of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict

19

remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, as in [*People v. Green* (1980) 27 Cal.3d 1 (*Green*)], the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129, fn. omitted.)

Here, the inadequacy claimed by Davis is merely factual: there was not substantial evidence that Van Fleet was alive when he was dumped in the aqueduct. The jury was able to detect if such a fact was proved. As such, the rule in *Green*, *supra*, 27 Cal.3d 1 does not apply and we apply the more lenient test in *Guiton*, *supra*, 4 Cal.4th at pages 1126 to 1129.

Accordingly, even if we were to assume that substantial evidence does not support a finding that Van Fleet was alive at the time he was dumped in the aqueduct, we find no error because a valid ground exists for the verdict of first degree murder and there is no affirmative indication in the record that the verdict actually did rest on the inadequate ground (i.e., drowning). As we note above, the jury verdict shows the jury was convinced beyond a reasonable doubt that the murder of Van Fleet was committed by lying in wait. Therefore, for the reasons we discuss above, the jury agreed Davis had aided and abetted Jones at the time Jones shot Van Fleet. There is no affirmative indication in the record that the verdict actually did rest on the inadequate ground. (See *Guiton*, *supra*, 4 Cal. 4th at pp. 1126-1129.)

20

## III

*SENTENCE*

Finally, Davis argues and the People concede that he was charged under an inapplicable subdivision of section 12022 so the sentences on the enhancements for being vicariously armed with a firearm should have been one year, not three. We agree.

As to counts 1, 2, and 3, Davis was alleged to have known a principal was personally armed with a firearm under section 12022, subdivision (d). The jury found this allegation true as to each count. The court sentenced Davis to prison for life without the possibility of parole, plus a consecutive term of three years for being vicariously armed with a firearm. The court stayed the sentence for the vicarious enhancements on count 2 and 3 under section 654.

The three-year enhancement was in error. The three-year penalty provided in section 12022, subdivision (d) only applies to the drug-related offenses listed in subdivision (c) of that code section. While the wrong subdivision was utilized, the jury was properly instructed on the vicarious use allegations and Davis should have been charged under section 12022, subdivision (a), which provides a penalty of one year in state prison.

## DISPOSITION

The judgment is modified to strike the three-year sentence based on the vicariously armed enhancement and replace it with a one-year sentence under section 12022, subdivision (a). The two stayed sentences on counts 2 and 3 based on the vicariously armed enhancements are similarly modified. The court is directed to amend

21

the abstract of judgment to reflect modification and forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.  In all other aspects, the judgment is affirmed.


                                                                HUFFMAN, Acting P. J.

WE CONCUR:


                         NARES, J.


                    McDONALD, J.