Filed 7/31/13  P. v. Hickey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOHN LEE HICKEY,<br><br>        Defendant and Appellant. | C070698<br><br>(Super. Ct. No. CM032218) |

This appeal arises out of a 26-hour standoff with law enforcement, during which defendant John Lee Hickey fired several times at the peace officers surrounding his residence.  Defendant was convicted on three counts of assault with a firearm upon peace officers with enhancements for personal discharge of a firearm (Pen. Code, §§ 245, subd. (d)(1), 12022.53, subd. (c)),[1] two counts of resisting a peace officer (§ 69), exhibiting a firearm in the presence of a peace officer (§ 417, subd. (c)), and two counts of child endangerment (§ 273a, subd. (a)).  The trial court sentenced defendant to serve an aggregate term of 49 years and 4 months in state prison.

---

[1]      Undesignated statutory references are to the Penal Code.

1

On appeal, defendant contends (1) the trial court erred in excluding evidence of an alleged sexual assault against his daughter C., thus depriving defendant of his defense that he acted in defense of his children, (2) the jury instructions improperly stated the law on refusal of admittance of peace officers serving a search warrant, (3) the evidence was insufficient to prove defendant fired shots in the direction of three peace officers, (4) the prosecutor engaged in misconduct by arguing defendant shot at Detective Nicodemus after the trial court struck the pertinent testimony from the record, (5) the trial court erred in failing to give a unanimity instruction for the three counts of assault upon peace officers with a firearm, (6) the jury should have been instructed on self-defense or imperfect self-defense for the charges of assault with a firearm upon peace officers, and (7) the trial court erred by making dual use of facts in imposing the upper term for the assaults upon peace officers with a firearm.

We reject defendant's claims of prejudicial errors at trial. With regard to defendant's first contention, we conclude any evidence regarding the alleged sexual assault of defendant's daughter would have offered no defense to the charges against defendant because his daughter was not at the scene where the standoff occurred. Next, the jury instruction on refusal of admittance was supported by the evidence. Third, sufficient evidence established that defendant fired shots at three officers as charged. Fourth, defendant forfeited the issue of prosecutorial misconduct because he did not object to the alleged prosecutorial misconduct at trial. Fifth, the trial court had no duty to give a unanimity instruction for the charges of assault upon a peace officer with a firearm because the same evidence applied to each of the three officers. Sixth, there was no error in not giving the self-defense instructions because defendant had no valid claim of self-defense because he did not challenge the validity of the search warrant or allege the officers acted unlawfully or with unreasonable force in executing the warrant. Finally, we conclude the imposition of the upper term is warranted based on a single aggravating factor the trial court properly relied upon. Accordingly, we affirm the judgment.

2

## FACTUAL AND PROCEDURAL HISTORY

### Prosecution Evidence

On the afternoon of February 9, 2010, seven deputies from the Butte County Sheriff's Department went to defendant's residence at 202 Grimy Gulch Road in Bangor, California, to serve a search warrant for firearms and ammunition. The deputies all wore clothing that identified them as sheriff's deputies. The deputies discovered that the only gate to defendant's residence was locked with a padlock and chain. Defendant's residence appeared to consist of two single-wide trailer homes that were placed several feet from each other. Cars and debris littered the rest of the large property. The deputies pushed over a weak part of the wire fence and went to the first door of the residence they came upon. Deputy Aaron Staup knocked loudly on the door and yelled several times, "Sheriff's office, search warrant, demanding entry." One of the deputies kicked the door open and discovered it was "a dead end" to a small room.

The deputies proceeded to the north side of the residence, where they repeated the knock/notice procedure at another door. Every window of the residence was covered so the deputies could not see inside. Approximately 30 seconds after the knock/notice, one of the deputies unsuccessfully tried to kick the door in. Kimberly Hickey -– defendant's wife at the time -– was in a bedroom of the trailer, getting ready to attend a domestic violence class.[2] She heard the deputies knocking and repeatedly announce themselves and that they were there to search for weapons.

Deputy Will Olive located a nearby axe and created a small hole in the door next to the door handle. Almost immediately after the hole was formed, someone on the other side of the door jabbed a large wooden stick through the door at Deputy Olive. The stick

---

[2] Due to shared surname and for the sake of clarity, we refer to members of the Hickey family by their first names.

"punched" Deputy Olive in the chest and took him by surprise. The stick was quickly withdrawn.

From inside the trailer, a male -– later identified as defendant -– began to shout, "Get the fuck off my property!" and, "The kids aren't here." Defendant also threatened to shoot the officers. The deputies immediately took cover behind a truck located 15 yards away from the door. A couple of minutes later, Deputy Staup heard defendant say, "I can see you behind the truck, see you behind that truck, and I'm going to shoot you." Deputy Staup ran to one of the patrol vehicles to retrieve a sniper rifle because he had special training as a sniper for the SWAT team. He retrieved his rifle and scope from the patrol vehicle. Though he was 64 yards from the trailer, the rifle scope's magnification made it appear only five yards away. Through the scope, Deputy Staup saw a hand stick out of the hole of the door, waving a revolver in the direction of the deputies at the perimeter. Deputy Olive testified defendant "[s]tarted yelling he was going to kill us; calling us fucking pussies; telling us to come do our job; telling us if we wanted a standoff, we have one now; telling us he had bullets that would go through metal; yelling that he could see us behind the truck; we wouldn't see our families tonight." The deputies sought cover behind vehicles.

Deputy Staup tried to calm defendant down by telling defendant they "weren't there for kids" but only to serve a search warrant for firearms. The deputy also asked whether there were any children present, but defendant did not respond. Defendant nailed something over the hole in the door. The deputies heard loud banging and the use of a power saw from inside the residence. Kimberly testified defendant was cutting the floor because he was angry. Defendant told her "he wasn't going to give up because he wasn't going to be locked in a cage."

Defendant's mother, Edna, and a friend named Kenny arrived about an hour later and rammed her car into the still-closed gate until they were able to drive onto the property. Edna appeared to be very upset, angry and told the deputies she wanted them

4

arrested for trespassing. She also told the deputies that "if she had the guns, she would kill [them] herself." Edna denied there were any children in the residence, telling the deputies they were all at her house. Edna and defendant communicated several times, and she relayed the offer that "[i]f he would come out unarmed onto the porch and talk," the deputies would put their guns down. The deputies also offered medical assistance when they learned defendant and his wife had heart problems. Edna remained at the property for a couple of hours before she left.

Several times during the standoff, the deputies believed defendant would come out of the trailer. At other times, defendant would yell that he could see the deputies behind the truck and threatened that he had armor-piercing rounds.

Shortly after 4:00 p.m., a shot rang out and Deputy Staup heard "BB's falling around [him]" that "indicated a shotgun" had been fired in his direction.

At approximately 8:30 p.m., Sergeant Steve Boyd set up a command post for the 16 members of his SWAT team that had arrived at the property. The SWAT team members formulated a plan to retrieve Deputy Martin, who had been the sole officer on the east side of the property for more than six hours. Sergeant Boyd made his way toward Deputy Martin's position along with a team that included Sergeant Bell, Deputy Allen, Sergeant Collins, and Detective Nicodemus. They used bolt cutters to cut through a fence on the east side of the property. Sergeant Boyd heard defendant call out, "I see you by the pole." The SWAT team members were standing next to a telephone pole at the time. Sergeant Boyd heard six gunshots from what sounded like a big gun being fired from the trailer toward his position. Sergeant Boyd grabbed Deputy Martin and threw him to the ground before himself taking cover on the ground. None of the deputies was injured. After about four minutes, the officers retreated.

Around midnight, one of the officers unsuccessfully attempted to shoot out a light on the trailer.

At approximately 2:00 a.m., SWAT team officers fired a total of 10 gas canisters under the trailer to get defendant to surrender. Shortly thereafter, Sergeant Boyd saw a weapon being fired from the trailer. There were a lot of rounds fired at that point. At 2:50 a.m., Officers Love and Bailey were positioned approximately 70 to 75 yards to the southeast of the residence. Officer Love heard six rounds fired from the trailer. Officer Love twice heard "the sound of bullets going through the grass about 30 feet to [his] right." The first time the grass was hit, the bullet seemed to come from small-caliber fire and the second time from a shotgun.

During the fifth shot, Officer Love saw "a big flash of the muzzle blast" that seemed to be aimed directly at him and Officer Bailey. Officer Love also heard "multiple pellets going past [them]." Officer Bailey returned fire. Immediately after Officer Bailey's shot, defendant fired directly back at them. Officer Love fell to the ground and yelled, "I've been hit." Officer Bailey radioed for help in evacuating from the post. After a short while, Officer Love realized he had not been shot. Instead, he had been knocked down from the gas and dirt resulting from Officer Bailey firing his gun. As Officers Love and Bailey were being evacuated, defendant yelled out, "man the fuck up," he had gotten his "second wind," and again called the officers "pussies." Defendant then yelled he had explosives in the trailer.

The Butte County SWAT team was replaced by the Redding Police Department SWAT team, which remained through the night. When the Butte County team returned the next morning, they used a heavily armored vehicle to switch team members from various positions around the property.

Sometime after midnight and before the end of the standoff, defendant told Kimberly he had shot and hit an officer. He also said "he was going to make law enforcement shoot him and he would not surrender."

Just as the officers were finalizing a plan to redeploy gas canisters to the trailer at 2:00 p.m., Kimberly and two children ran out of the trailer. She had delayed leaving

6

because she was afraid defendant would kill himself.  Kimberly was crying and appeared to be shaken and scared.

At 3:33 p.m., the Chico Police Department SWAT team used the armored vehicle to approach the trailer, puncture it, and send in three gas canisters.  As a result, defendant came crawling out of the trailer holding a stick.  Defendant appeared to be very apologetic and asked if anyone had been hurt.  Upon being informed an officer had been shot, defendant began to cry and told the officers "he was sorry, he didn't mean to hurt anybody."  The officers called for medical attention because defendant was complaining about his heart.

### Defense Evidence

Defendant testified on his own behalf as follows:  He and Kimberly had lived at 202 Grimy Gulch Road for 17 years.  They had 10 children together.  However, most of the children were not living with defendant and Kimberly.  Four had run away, and defendant had taken three out of town to protect them after the police had previously shown up at the property.

On February 9, 2010, the only children at the residence with defendant and his wife were Michaela and Jesse.  Earlier that day, defendant called the Oroville Police Department to try "to get aid for [his] children."  Defendant planned to take Kimberly to a parent support group later that day.  Defendant was in a great deal of physical pain and lay down to rest before taking her to her appointment.  Defendant awoke to the sound of pounding, noise, and screaming.  Defendant's children were screaming, "Help us, Daddy. Help us."  Defendant did not know what was going on.

Defendant got up, took his stick with him, and went to the door.  He felt a strong urge that he needed to defend his family.  He placed the stick through the hole in the door and fell to his knees without the aid of the stick.  Kimberly and the children were in the other trailer on the opposite side of their residence.

7

Defendant recalled talking with his father on the phone but could not remember for how long. He was experiencing "extreme mental distress" because he was "not getting help" for "what was going on in [his] life." Defendant was not aware of what was going on outside the trailer because the windows were all covered.

At some point, defendant heard sounds "like bricks or wood or rocks" being thrown against the trailer. In the chaos, he "was trying to defend [his] kids." Defendant "just lost all track of time and everything, and [did not] know what [he] was doing at that time."

Defendant had firearms in the trailer, which he used "[c]ountless times" to shoot at trees and other targets on the property. He was aware there was a restraining order against him, but was unable to read it and therefore did not know he was prohibited from possessing firearms.

At some point during the night, defendant thought he had been shot by a shotgun. He yelled for his children to "[g]et on the floor." He "vaguely" heard Kimberly and his children coughing and gagging but never was aware of any tear gas inside the trailer.

Defendant eventually made Kimberly and the children leave even though Kimberly said, "I want to stay with you till the end." Later, when white gas filled the trailer, defendant slid out of the trailer on his stomach because he weighed 335 pounds at the time. The officers ran up to him, insulted him, and hit him repeatedly with their knees.

### *Rebuttal Evidence*

Called by the prosecution, Kimberly testified defendant was present with her in court on May 11, 2009, when she and defendant were ordered not to have any firearms. When the deputies showed up to serve the search warrant on February 9, 2010, defendant was not asleep as he had claimed. Instead, defendant and Kimberly were on the porch getting ready to attend a domestic violence class.

Detective Chris D'Amato worked as a hostage negotiator during the standoff. He testified defendant told him over the telephone: "I'm well versed in the arts of death." "Nothing wrong with my trigger finger." "I see the people behind the truck, and I will shoot them." "Kim's not here, nobody's here." "You are forcing my hand, there's going to be a barrel full of pigs, it's going to be loud." "It's going to go real fast. I got my second wind, enough to end the game." "I have more than one gun, but it's not the guns you should be worried about."

Detective D'Amato noted defendant was extremely upset his children had been taken from him. Defendant also expressed concern about his daughter having been raped. The detective tried to get more information about the alleged rape, but defendant's responses on the subject were vague and disjointed. Detective D'Amato learned the incident had been reported to the sheriff's office and involved "underage kids engaging in sexual activity" and "definitely wasn't rape." Defendant believed there had been an injustice for lack of prosecution. Defendant also suggested the standoff could be ended by bringing his children to him. Eventually, defendant unplugged the telephone.

## DISCUSSION

### I

### *Exclusion of Evidence of Alleged Sexual Assault on Defendant's Daughter*

Defendant contends the trial court erred by excluding "evidence that [his] daughter had been molested while in foster care, that he knew of the molestations, and that his resistance was motivated by a reasonable apprehension that the officers were on his property to take the children back to foster care." In so arguing, defendant concedes he acted "unreasonably" in "defense of his children." As defendant notes, his argument depended on his belief his daughter, C., was raped while she was in foster care. As we explain, the argument has no merit.

9

## A.

### *Exclusion of Evidence Regarding Alleged Rape of Defendant's Daughter*

Prior to the start of trial, the prosecution made a motion "that the alleged sexual assault of the defendant's daughter should be excluded as both irrelevant and prejudicial and a waste of time." The prosecutor informed the court the allegation arose from an incident in May 2009, when "the defendant's son allegedly saw his 15-year old sister cuddling up and getting felt up by the foster mother's 23-year-old son. That son by the name of James told [defendant] about this particular activity, in which the defendant spoke to his 15-year-old daughter, who said it didn't happen and was apparently, quote, unquote, 'uncooperative.'" During an investigation into the claim, the daughter, C., denied there was any sexual activity. Thereafter she gave defendant a letter stating she was touched sexually. Defendant then reported the incident to the Butte County Sheriff's Department in August 2009. C. later claimed the contact was consensual.

The prosecutor also noted all 10 of defendant's children were removed from his home in January 2009 based on allegations he had been abusing them with a baseball bat. Two of the children, Michaela and Jesse, ran away from their foster care placements and were at defendant's residence on February 9, 2010. At the time, defendant was under a restraining order prohibiting him from having any contact with his children because "he was not following the Court orders of family court in that he was not testing for drugs, he was not attending anger management, and he was not attending supervised visitations in an appropriate manner." Neither Michaela nor Jesse made any allegations of abuse while in foster care.

Defense counsel opposed the motion, arguing that if the prosecution were going to allow Detective D'Amato to testify, the allegation of rape would provide the necessary context. The defense explained that "it certainly has to be understood as far as a context as to what was taking place at the time that law enforcement was having its contact with [defendant] at the Grimy Gulch Road address."

10

The trial court granted the motion to exclude, stating: "The Court has carefully considered counsel's motions in limine and argument on this issue. I have reviewed Evidence Code 210, which is cited by the People, and also Evidence Code 352. [¶] The Court is granting the motion to exclude the alleged sexual assault of Defendant's daughter as irrelevant. I find that it would confuse the issues before this jury. Just the People's recitation of the underlying chronology of the children being removed and then C[.]'s statements, various statements, indicate to this Court that a discussion of those issues in this trial would be confusing to the jury and would take up an undue consumption of time, would create a mini trial for the allegations. [¶] And, I've looked at every possible way in which those statements could be probative to issues before this jury or to an affirmative defense of any kind, and I do not find that there is any relevance to the allegations for the crimes that the defendant is charged with."

## B.

### *Unreasonable Self-defense Was Not an Available Defense*

We agree with the trial court that the alleged sexual assault of C. had no probative value and offered no defense to the charges against defendant.

In his argument, defendant fails to mention a critical fact: C. was not present in the trailer or at the property during defendant's standoff with law enforcement. As the California Supreme Court has held, "both self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868.) Defendant was not entitled to rely on his belief that C. had been sexually assaulted seven months before the standoff to justify his shooting at the officers. Because C. was neither in the trailer nor even on the property with defendant during the standoff, defendant could not have tendered a defense based on defense of C.

Moreover, defendant concedes he engaged, at best, in unreasonable self-defense. Unreasonable self-defense applies to charges of murder, not assault on or resisting peace officers. As the Supreme Court has explained, " 'imperfect self-defense is not an

11

affirmative defense, but a description of one type of voluntary manslaughter.' " (*People v. Michaels* (2002) 28 Cal.4th 486, 529.)  Thus, " '[f]or *killing* to be in self-defense, the defendant must actually and reasonably believe in the need to defend.  [Citation.]  If the belief subjectively exists but is objectively unreasonable, there is "imperfect self-defense," i.e., "the defendant is deemed to have acted without malice and cannot be convicted of murder," but can be convicted of manslaughter.  [Citation.]' " (*People v. Battle* (2011) 198 Cal.App.4th 50, 72, italics added.)

The defense of imperfect self-defense negates for the charge of murder "the crucial characteristic of 'malice aforethought' . . . , i.e., awareness that one's conduct does not conform to the expectations of society" so that reduction to voluntary manslaughter is appropriate.  (*People v. Hayes* (2004) 120 Cal.App.4th 796, 802.)  By contrast, "[a] person who carefully weighs a course of action, and chooses to kill after considering reasons for and against, is normally capable of comprehending his [or her] societal duty to act within the law.  'If, *despite such awareness*, he [or she] does an act that is likely to cause serious injury or death to another, he [or she] exhibits that wanton disregard for human life or antisocial motivation that constitutes malice aforethought.' " (*People v. Hayes, supra,* 120 Cal.App.4th at pp. 802-803.)  However, the charges of assault on and resisting peace officers[3] do not contain the "element of knowing violation

---

[3]     Section 245, subdivision (d) (1), provides, "Any person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years."

Section 69 provides, "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his [or her] duty, is punishable by a fine not exceeding ten

12

of social norm" and are thus not subject to exoneration for imperfect self-defense. (*Id.* at p. 803 [rejecting imperfect self-defense for the charge of mayhem because it does not negate any intent to "vex, injure, or annoy"].)

Defendant was not entitled to present evidence of his belief that his daughter had previously been sexually assaulted to defend against the charges for which he was convicted. C. was not at the property and thus not in any imminent harm. And, the possibility defendant's other children might be subject to similar harm later when returned to foster care also did not constitute imminent danger that justified defendant's standoff with law enforcement. Accordingly, the trial court did not err in excluding the evidence from trial.

## II

### *Instruction on Refusal of Admittance Factors*

Defendant contends the trial court committed prejudicial error in instructing the jury it could consider the sound of footsteps from inside the residence in determining whether the deputies were acting lawfully when they broke the entrance door after knocking and giving notice. We reject the argument.

### A.

### *Instruction*

On the charge of assault upon a peace officer with a deadly weapon (§ 245, subd. (d)(1)), the jury was instructed with CALCRIM No. 860. As relevant here, the instruction informed the jury that the People had the burden of proving "[w]hen the defendant acted, he knew, or reasonably should have known, that the person assaulted was a peace officer who was performing his [or her] duties." The instruction further stated:

---

thousand dollars ($10,000), or by imprisonment pursuant to subdivision (h) of Section 1170, or in a county jail not exceeding one year, or by both such fine and imprisonment."

13

"A peace officer is 'engaged in the performance of his [or her] duties' if he [or she] is attempting to effect service of a search warrant signed by a magistrate, valid on its face, which authorizes the search of certain premises or places, or the search of certain persons.

"You must decide if the officer notified the occupant of his [or her] presence by knocking or employing some other means reasonably calculated to notify the occupants of his [or her] presence and identified himself as a Peace officer and explained the purpose of his [or her] demand for admittance.

"The law permits a peace officer to break open any outer or inner door or window of a house or any part of a house or anything therein to execute the warrant, if, after notice of his [or her] authority and purpose, he [or she] is refused admittance.

"In determining if there was a refusal of admittance, you may consider the length of time of announcement of authority and purpose, *the hearing of footsteps inside*, the reasonable belief that persons are inside, the lack of response to the announcement, the safety of the peace officer, the substantial delay between the announcement and entry." (Italics added.)

Defendant challenges the italicized portion of the instruction as unwarranted by the evidence presented at trial.

## B.

### *Substantial Evidence Supported the Instruction as Given*

The California Supreme Court has explained that "proper service of a warrant is a jury issue under the engaged-in-duty requirement" for the charge of assault of a peace officer. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1223 (*Gonzalez*), superseded by statute on another ground as recognized in *In re Steele* (2004) 32 Cal.4th 682, 691.) In *Gonzalez*, the Supreme Court considered the argument that the trial court in that case "eliminated from the jury's engaged-in-duty analysis the issue whether the warrant was lawfully executed." (*Ibid.*) The *Gonzalez* court rejected the contention on grounds the

14

jury was properly informed on the factors to consider for the engaged-in-duty test. (*Ibid.*) Specifically, the jury in *Gonzalez* was instructed that "an officer executing a warrant upon a house may break and enter 'if, after announcing notice of his [or her] authority and purpose, he [or she] is refused admittance." (*Ibid.*) The jury was instructed it could consider the following factors in deciding whether there was a refusal of admittance: "The law permits a peace officer to break open any outer or inner door or window of a house or any part of a house or anything therein to execute the warrant, if, after notice of his [or her] authority and purpose, he [or she] is refused admittance. [¶] In determining if there was a refusal of admittance, you may consider the length of time of announcement of authority and purpose; the hearing of footsteps inside; the reasonable belief that persons are inside." (*Id.* at p. 1223, fn. 20.)

The instruction on refusal of admittance in this case was nearly identical to that approved by the Supreme Court in *Gonzalez*. Nonetheless, defendant contends the trial court committed instructional error because "there was no evidence that the officers heard anything from inside the residence before Deputy Olive was struck by a stick." Defendant's argument rests on the assertion the evidence was insufficient to warrant instructing the jury it could consider "the hearing of footsteps inside" in deciding whether the deputies acted reasonably in breaking the trailer door. We reject the assertion.

The trial court properly instructed on refusal of admittance because the jury had evidence in the form of Kimberly's testimony upon which it could have concluded the officers heard footsteps from inside the trailer immediately before they broke the entrance door. During the prosecution's case-in-chief, Kimberly testified:

"Q. Okay. So you hear these officers yelling, saying 'search warrant'?

"A. Yes.

"Q. Did they say 'for guns'?

"A. 'For weapons.'

"Q. 'For weapons.' You heard that?

15

"A. Yes.

"Q. And you heard somebody break the door open and create a hole?

"A. Uh-huh.

"Q. Okay. And what did [defendant] do when the officers were banging on the door?

"A. He was just walking back and forth and not letting them in.

"Q. Was he pacing?

"A. Yes.

"[¶] . . . [¶]

"Q. Was he using a walking stick?

"A. Yes.

"Q. Was he using a wheelchair?

"A. No."

This testimony combined with defendant's admission he weighed 335 pounds during the standoff provided substantial evidence sufficient to warrant a jury instruction that the sound of footsteps could be considered on the issue of refusal of admittance. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 823.) Accordingly, the trial court did not commit instructional error.

Even if the instruction that the jury could have considered the sound of footsteps would have been unwarranted by the evidence, we would nonetheless affirm in this case. A jury instruction that is correct in stating the law but irrelevant due to lack of evidence to which it corresponds is an "abstract instruction." (*People v. Cross* (2008) 45 Cal.4th 58, 67.) As the Supreme Court has noted, "giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' (*Ibid*.)" (*People v. Cross, supra,* 45 Cal.4th at p. 67.) Here, the evidence established defendant deliberately refused to comply with the search warrant and then held the officers at bay by shooting at them numerous times. Kimberly's testimony in

16

particular showed defendant reacted angrily to the knock/notice given by the deputies. And, the evidence that defendant shot at the peace officers over the course of more than a day is overwhelming. Consequently, any error in the giving of an abstract instruction regarding the sound of footsteps was harmless under any standard of prejudice. (*People v. Houston* (2012) 54 Cal.4th 1186, 1225.)

## III

### *Evidence in Support of Assault on Officers Boyd, Bell, and Nicodemus*

Defendant next contends insufficient evidence supported his conviction of assault with a deadly weapon on Officers Boyd, Bell, and Nicodemus.[4] Specifically, he asserts there was no "evidence that shots were fired in their direction" because "the shots may have been fired in the air, or in another direction." We disagree.

### A.

### *Assessing Sufficiency of the Evidence Claims*

In reviewing a claim of insufficient evidence in support of a criminal conviction, we apply the substantial evidence standard of review. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) "The standard of review is well settled: On appeal, we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -— that is, evidence that is reasonable, credible and of solid value -— from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Jackson v. Virginia* (1979) 443 U.S. 307, 317–320, 61 L.Ed.2d 560; *People v. Johnson* (1980) 26 Cal.3d 557, 578.) ' "[I]f the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) 'The standard of review is the same in cases in which the

---

[4] When referring to Sergeant Boyd, Sergeant Bell, and Detective Nicodemus as a group, we use the term "officers" to describe their law enforcement status.

17

People rely mainly on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." ' (*People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)" (*People v. Snow*, *supra*, at p. 66.)

**B.**

### *Assault Against Officers Boyd, Bell, and Nicodemus*

The three convictions for assault upon a peace officer with a firearm arise out of defendant's firing six shots when a team that included Officers Boyd, Bell, and Nicodemus went to extract Deputy Martin around 8:30 p.m. on the evening of the standoff. As defendant correctly points out, the trial court struck some testimony of Sergeant Boyd and Detective Nicodemus that they each believed they were fired upon. Nonetheless, the remaining testimony of the officers constituted substantial evidence defendant fired upon Officers Boyd, Bell, and Nicodemus.

Sergeant Boyd testified he and his team –- including Sergeant Bell and Detective Nicodemus –- arrived at Deputy Martin's position on the southeast side of the trailer around 8:30 p.m. When the officers had cut through the fence to reach Deputy Martin, they heard defendant calling out, "I see you by the pole." Sergeant Boyd saw "the pole was right next to [them]." Sergeants Boyd and Bell immediately "moved the team back to get out of the way" by retreating back to the fence. When they had moved 10 feet, "six shots [were] fired" from the trailer. The shots were loud. In response, Sergeant Boyd grabbed and threw Deputy Martin to the ground before himself dropping onto the ground. Sergeant Boyd worried about being hit because they "were still lighting [themselves] with the moonlight or ambient light."

Sergeant Boyd additionally testified that "when he heard the shot and . . . dove for cover on the ground" he "perceive[d] that [he was] being shot at." As he explained, "I

18

didn't have any doubt that shots were aiming at us. Just because of all the circumstances put together, I didn't have any doubt. That's why I dove for cover." This testimony was not stricken.

Detective Nicodemus also heard defendant call out, "I see you by the pole." At the time, he "was standing by a pole." He also dropped to the ground as soon as he heard the shots "[t]rying not to get shot." When asked if he perceived the shots coming in his direction, Detective Nicodemus answered that "[a]fter the first two shots, [he] left the area." He further testified Kimberly later told him defendant "shot law enforcement" and "hit an officer."

Likewise, Sergeant Bell testified he took cover in the bushes behind the pole after defendant yelled, "I see you by the pole." Sergeant Bell "tossed" Sergeant Collins on the ground as well.

These trained officers dove for the ground after hearing loud shots fired in their direction by defendant. Defendant called out their position before firing six shots at them. He did so after his earlier taunting of the officers that he was going to shoot them and they should not expect to see their families that night. Sergeant Boyd had no doubt defendant was aiming at him and his fellow officers who had gone to retrieve Deputy Martin. Moreover, defendant's statements to Kimberly that he shot at the officers and hit one of them provide additional evidence of his assault on Officers Boyd, Bell, and Nicodemus. The testimony introduced on the assaults against these officers is sufficiently solid and credible to constitute sufficient evidence to affirm defendant's convictions.

## IV

### *Prosecutorial Misconduct*

Defendant contends the prosecutor engaged in misconduct by referring to stricken testimony when she argued evidence showed Detective Nicodemus believed defendant was shooting at him. The Attorney General counters defendant forfeited the claim by

19

failing to make a timely objection to the alleged prosecutorial misconduct or asking the trial court to admonish the jury.  We agree the contention has not been preserved for appellate review.

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted." ' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 679, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 298.)  Under the federal constitution, prosecutorial misconduct results if "the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181, 91 L.Ed.2d 144.)" (*People v. Riggs*, *supra*, at p. 298.)  However, " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion -— and on the same ground -— the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.  [Citation.]" ' " (*People v. Riggs*, *supra*, 44 Cal.4th at p. 298, quoting *People v. Stanley* (2006) 39 Cal.4th 913, 952.)

Here, defendant did not object to the alleged prosecutorial misconduct or ask that the jury be admonished.  We reject defendant's suggestion, in his reply brief, that defense counsel's mere objection to the testimony of Sergeant Boyd and Detective Nicodemus should suffice as objections to the alleged misconduct.  As the Supreme Court has held, the objection in the trial court must be "on the same ground" as that asserted on appeal. (*People v. Riggs*, *supra*, 44 Cal.4th at p. 298.)  Consequently, the issue of prosecutorial misconduct has not been preserved for appeal.

In his opening brief, defendant does not argue any objection would have been futile or that he received ineffective assistance of counsel for lack of objection to the alleged misconduct.  To the extent defendant raises these arguments for the first time in

20

his reply brief, they are untimely. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.)

V

*Failure to Instruct on Juror Unanimity*

Defendant contends the trial court erred in failing to give sua sponte a unanimity instruction for the charges of assault upon a peace officer with a firearm as to Officers Boyd, Bell, and Nicodemus. Defendant asserts that "the evidence raises the possibility that some jurors could conclude that one of the officers was shot at, other jurors could conclude that another officer was shot at, and there was no unanimous agreement that any one officer was shot at." We are not persuaded.

A.

*Duty to Instruct on Juror Unanimity*

It is well settled that " 'a criminal conviction requires a unanimous jury verdict (Cal. Const., art. I, § 16; *People v. Wheeler* (1978) 22 Cal.3d 258, 265).' [Citation.] What is required is that the jurors unanimously agree [the] defendant is criminally responsible for '*one discrete criminal event*.' (*People v. Davis* (1992) 8 Cal.App.4th 28, 41, original italics.) '[W]hen the accusatory pleading charges a single criminal act and the evidence shows more than one such unlawful act, *either* the prosecution must select the specific act relied upon to prove the charge *or* the jury must be instructed . . . that it must unanimously agree beyond a reasonable doubt that defendant committed the same specific criminal act.' (*People v. Gordon* (1985) 165 Cal.App.3d 839, 853, fn. omitted, original italics.)" (*People v. Thompson* (1995) 36 Cal.App.4th 843, 850.)

In cases in which "the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) Thus, a unanimity instruction is not required where different

21

criminal acts are "so closely connected as to form a single transaction or where the offense consists of a continuous course of conduct." (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 631.) Nor is the instruction required where " 'the acts were substantially identical in nature, so that any juror believing one act took place would inexorably believe all acts took place.' " (*People v. Wolfe* (2003) 114 Cal.App.4th 177, 184.) In short, " '[a] unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him [or her] of the crime charged.' (*People v. Gonzalez* (1983) 141 Cal.App.3d 786, 791, disapproved on another ground in *People v. Kurtzman* (1988) 46 Cal.3d 322, 330.) In other words, '[i]f under the evidence presented such disagreement is not reasonably possible, the instruction is unnecessary.' (141 Cal.App.3d at p. 792; see also *People v. Schultz* [(1987)] 192 Cal.App.3d [535,] 539-540, and *People v. Bergschneider* (1989) 211 Cal.App.3d 144.)" (*People v. Muniz* (1989) 213 Cal.App.3d 1508, 1518.)

## B.

### *The Shots Fired at Officers Boyd, Bell, and Nicodemus*

Here, the trial court instructed the jury on unanimity only as to the two counts of child endangerment.[5] Nonetheless, we conclude the failure to instruct on unanimity as to the counts of assault upon a peace officer with a firearm was not error because the evidence did not allow the jury to split on the victims or the acts upon which they convicted.

---

[5] The trial court gave CALCRIM No. 3500 as follows: "The defendant is charged with child endangerment in Counts 5 and 6 [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

22

The prosecution clearly identified Officers Boyd, Bell, and Nicodemus as the three victims for which defendant was charged with three counts of assault upon a peace officer with a firearm. Officers Boyd, Bell, and Nicodemus each recounted hearing defendant yell, "I see you by the pole." At the time, each of three officers testified he was standing close to the pole. The officers heard six loud gunshots coming from the nearby trailer, and each immediately dove to the ground in response. As we have previously noted, Sergeant Boyd testified he had no doubt defendant was aiming at them.

The rapid succession of shots fired at the officers was a series of "criminal acts so closely connected as to form a single transaction" or continuous course of conduct. (*People v. Sanchez, supra*, 94 Cal.App.4th at p. 631.) Here, no unanimity instruction was required because the evidence essentially left the jury with an all-or-nothing decision as to whether the shots were fired at Officers Boyd, Bell, and Nicodemus. The agreement in the officers' testimony about the shots and their proximity to the pole did not allow parsing the evidence to convict on only one or two of the assault charges relating to this portion of the standoff.

Defendant urges us to find error on the basis of our prior decision in *People v. McNeill* (1980) 112 Cal.App.3d 330. In *McNeill*, this court found the trial court erred in failing to give a unanimity instruction for the charge of assault with a deadly weapon that could have been premised on any of "a rapid series of shots in the direction of the victim's four friends." (*Id.* at p. 334.) Even though the defendant was charged with only one count of assault with a deadly weapon, the trial court did not instruct that the jury must unanimously agree on which of the four friends served as the victim for purposes of conviction. (*Id.* at pp. 335-336.) As we explained, "The possibility that the jurors may have come to different conclusions as to the identity of the assault victim vitiates the constitutionally required assurance of juror unanimity as to the assault conviction. While it is of course possible that the jurors agreed unanimously as to a particular victim of the

23

assault, such agreement would necessarily be fortuitous in the absence of a proper instruction." (*Ibid.*)

Similarly distinguishable is defendant's cited case of *People v. Gibson* (1991) 229 Cal.App.3d 284. *Gibson* involved a challenge to an enhancement for the defendant's drunk driving that resulted in an injury to more than one person. (*Id.* at pp. 285-286; former Veh. Code, § 23182.) The *Gibson* court reversed the enhancement for failure of the trial court to instruct that the jury unanimously agree on which of the other three victims of the auto accident served as the basis for the enhancement. (*Id.* at p. 287.) The instructions in that case required the jury only believe " 'someone' was injured," even though three different people could have potentially been considered injury victims. (*Ibid.*)

In contrast to *McNeill* and *Gibson*, the jury in this case was not asked to select one or two among more potential victims. Instead, each of the three victims –- Officers Boyd, Bell, and Nicodemus –- was specifically identified for the jury. And, for each victim there is no way to parse the evidence into differing instances of assault on the officers. Thus, no unanimity instruction was necessary. (*People v. Muniz*, *supra*, 213 Cal.App.3d at p. 1518.)

## VI

### *Failure to Instruct on Self-defense*

Defendant next claims the trial court erred by omitting from CALCRIM No. 860, the instruction defining assault upon a peace officer with a firearm language that the prosecution must prove: "The defendant did not act (in self-defense/ [or] in defense of someone else)." The People respond that defendant did not argue self-defense at trial nor was there substantial evidence in support of self-defense. The record indicates defendant did not argue self-defense and there was insufficient evidence warranting instruction on

24

this point.[6] However, we reject defendant's argument on a more fundamental point: defendant had no valid claim of self-defense against the proper service of a search warrant.

At trial, defendant did not claim the search warrant was invalid or that the officers used excessive force so self-defense might be justified. To the contrary, defense counsel's closing argument admitted jurors might be thinking to themselves, "I didn't hear anything in terms of [the officers] not legitimately being there" to serve the warrant. Moreover, defense counsel acknowledged: "And again, I'll, I'll give kudos in terms of law enforcement has acted in terms of restraint." Nothing in defendant's testimony or closing argument challenged the validity of the search warrant or alleged excessive force in serving the warrant. Under these circumstances, defendant did not have a valid self-defense claim that excused shooting at the peace officers.

As the California Supreme Court has explained, "if a warrant is valid on its face, an officer carrying out its command to search or arrest is lawfully engaged in duty, and his or her attacker may be convicted and punished on that basis, even if the facts

---

[6]     The trial court's sua sponte duty to instruct on self-defense arises only if it appears the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 157.)

Here, the defense did not request an instruction on self-defense. Moreover, defendant's testimony and argument to the jury about his lack of awareness regarding what was transpiring was inconsistent with a defense that he was acting in self-defense in response to an imminent threat of injury to himself or the others in the trailer with him. (*People v. Butler*, *supra*, 46 Cal.4th at p. 868 [requiring actual fear of imminent harm for a claim of self-defense].) Defendant testified he simply did not understand what was going on during the standoff and he only waved a toy gun at the officers. Defendant testified there was "[j]ust like a loud snap or pop in [his] head" after which events "kind of went hazy." He also asserted he did not "know what was going on outside." And, he testified it was a nonfunctioning "Airsoft gun" belonging to his children that he waved around.

disclosed to the magistrate in support of the warrant were not legally sufficient to establish probable cause. A contrary construction of the engaged-in-duty requirement would defy reason. By overlooking the traditional statutory authority and duty of peace officers to execute facially regular warrants, such an interpretation would misapply the premise that an officer has no 'duty' to take 'illegal' action. It would ignore the historic preference for warrants. And it would undermine the Legislature's efforts to deter and punish violence upon peace officers acting in that capacity. The law has long been concerned with the treatment of a citizen who resists or obstructs the assertion of police authority. Since 1872, section 148 has made it a misdemeanor to resist, delay, or obstruct an officer engaged in discharging 'any duty of his [or her] office.' Unjustified violence against an officer, as against any other citizen, was also punishable under the general statutes defining assault, battery, attempted murder, and homicide." (*People v. Gonzalez, supra,* 51 Cal.3d at p. 1218.)

The *Gonzalez* court recognized that for warrantless arrests and searches "[m]isunderstandings may arise in the heat of the moment about the officer's intentions, motives, good faith, and authority. A citizen confronted in such circumstances may have a colorable basis for belief that the unilateral police attempt to restrict his [or her] freedom or invade his [or her] privacy is arbitrary and wrongful." (*People v. Gonzalez, supra*, 51 Cal.3d at p. 1220.) However, "[w]hen the police submit their suspicions for judicial evaluation, obtain a warrant regular on its face, and act only as it expressly authorizes and commands, no issue of fault in the serving officer's 'performance of . . . duties' arises. He [or she] and his [or her] colleagues have done everything possible to perform their 'duty,' and to do so lawfully." (*Id.* at p. 1220-1221.)

The *Gonzalez* court concluded that "a warrant removes all colorable basis for on-the-spot disputes about the officer's authority. That a citizen might have reason to suspect a warrant's underlying support, or that he [or she] might later prevail in a judicial attack on the warrant, has no rational relationship to the degree of his [or her] culpability

26

for violent resistance at the moment the warrant is served.  Forcible resistance to a warrant invokes society's particular 'abhor[rence]' of violence against persons whose official roles as defenders of public safety place them at special risk.  (See *People v. Rodriguez* (1986) 42 Cal.3d 730, 781.)  By its nature, violence of this kind '. . . hinder[s] the completion of vital public safety tasks; . . . evince[s] a particular contempt for law and government; and . . . strike[s] at the heart of a system of ordered liberty. . . .'  (*Ibid*.)  Such resistance thus justifies the special treatment our statutes accord to those who attack peace officers lawfully 'performing [their] duties.'  (*Ibid*.)"  (*People v. Gonzalez, supra*, 51 Cal.3d at pp. 1220-1223.)

Defendant had no valid claim of self-defense because he did not challenge the validity of the search warrant or allege the officers acted unlawfully or with unreasonable force in executing the warrant.  Consequently, the trial court did not err in failing to instruct sua sponte on the theory of self-defense.

## VII

### *Imposition of Upper Term for Assault upon a Peace Officer with a Firearm*

Defendant contends the trial court erred by making dual use of facts by selecting the upper term for his convictions of assault upon peace officers with a firearm based on the same factors constituting elements of crimes for which he was convicted.  Although the record does support defendant's contention the trial court made improper dual use of several facts, we affirm nonetheless because there is a single aggravating factor upon which the trial court properly relied in imposing the upper term.

For the convictions of assault upon peace officers with a firearm the trial court found the following circumstances in aggravation:  the threat of great bodily harm, defendant engaged in conduct that indicates a serious danger to society, he was aware peace officers were outside the trailer, he shot at the officers multiple times, he used his walking stick as a weapon, and there were multiple victims.  The only circumstance in

27

mitigation found by the trial court pertained to defendant's insignificant prior criminal record.

As defendant points out, all of the circumstances in aggravation –- except engaging in violent conduct indicating a serious danger to society –- were elements of the assaults and resisting arrest for which defendant was convicted.

Whatever the error in relying on other factors, the trial court was entitled to consider defendant's violent conduct indicating a serious danger to society as a circumstance in aggravation. Circumstances in aggravation include: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." "The defendant was armed with or used a weapon at the time of the commission of the crime," and "[t]he defendant has engaged in violent conduct that indicates a serious danger to society." (Cal. Rules of Court, rule 4.421(a)(1), (2) & (b)(1).)

The trial court's finding of conduct indicating serious danger to society suffices to justify the selection of the upper term for defendant's assaults on peace officers with a firearm. As the California Supreme Court has held, " 'Improper dual use of the same fact for imposition of both an upper term and a consecutive term or other enhancement does not necessitate resentencing if "[i]t is not reasonably probable that a more favorable sentence would have been imposed in the absence of the error." ' (*People v. Coleman* [(1989)] 48 Cal.3d [112,] 166.) Only a single aggravating factor is required to impose the upper term (*People v. Castellano* (1983) 140 Cal.App.3d 608, 614–615) . . . ." (*People v. Osband* (1996) 13 Cal.4th 622, 728.)

Here, there was a single aggravating factor the trial court properly relied upon to impose the upper term. Thus, any error by the trial court in finding the upper term to be warranted was not prejudicial in this case. (*People v. Scott* (1994) 9 Cal.4th 331, 355 [appellate court will not reweigh circumstances in mitigation and aggravation to second-guess trial court's selection of prison term].)

DISPOSITION

The judgment is affirmed.


                                                                   _____HOCH_____, J.


We concur:


_____BLEASE_____, Acting P. J.


_____BUTZ_____, J.